UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ANTHONY S. KODES, | CASE NO. 1:15CV1157 |
| Plaintiff, | |
| v. | JUDGE DONALD C. NUGENT |
| | Magistrate Judge George J. Limbert |
| CAROLYN W. COLVIN,[1] | |
| ACTING COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE |
| Defendant. | |

Plaintiff Anthony S. Kodes ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of Social Security Administration, denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1. In his brief on the merits, filed on October 16, 2015, Plaintiff claims that the administrative law judge's ("ALJ") decision that he could perform sedentary work was not supported by substantial evidence. ECF Dkt. #13. For the following reasons, the undersigned RECOMMENDS that the Court AFFIRM the ALJ's decision and dismiss the instant case in its entirety with prejudice.

## I.     FACTUAL AND PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on February 29, 2012 and April 10, 2012, respectively. ECF Dkt. #10 ("Tr.") at 43.[2] These claims were denied initially and upon reconsideration. *Id.* Plaintiff then requested a hearing before an ALJ, and on October 17, 2013, an ALJ conducted an administrative hearing and accepted the testimony of Plaintiff, who was

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2]All citations to the Transcript refer to the page numbers assigned when the Transcript was filed in the CM/ECF system rather than the page numbers assigned when the Transcript was compiled. This allows the Court and the parties to easily reference the Transcript as the page numbers of the .PDF file containing the Transcript correspond to the page numbers assigned when the Transcript was filed in the CM/ECF system.

represented by counsel, and a vocational expert ("VE"). *Id.* at 59-94. On March 21, 2014, the ALJ issued a decision denying Plaintiff's applications for DIB and SSI. *Id.* at 40-54. Plaintiff appealed, and the Appeals Council denied review on April 10, 2015. *Id.* at 5.

On June 9, 2015, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. On October 16, 2015, Plaintiff, through counsel, filed a brief on the merits. ECF Dkt. #13. Defendant filed a brief in response on November 13, 2015. ECF Dkt. #14. Plaintiff did not file a reply.

## II.     RELEVANT PORTIONS OF THE ALJ'S DECISION

On March 21, 2014, the ALJ issued a decision finding that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2014 and that Plaintiff had not engaged in substantial gainful activity since May 1, 2009, the alleged onset date. Tr. at 45. The ALJ found that Plaintiff suffered from the following severe impairments: complex regional pain syndrome affecting the right shoulder; right shoulder degenerative disease; a bilateral superior labral from anterior to posterior ("SLAP") tear; and bilateral rotator cuff tendinosis. *Id.*

Proceeding, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. at 45. The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), with the following restrictions: lifting or carrying up to ten pounds occasionally; standing and/or walking for six hours in an eight-hour workday; sitting for six hours in an eight-hour workday, with the opportunity to alternate between sitting and standing every hour for about five minutes; occasionally climbing ramps and stairs; occasionally bending, balancing, stooping, and kneeling; never crawling; frequently reaching in front and occasionally reaching overhead; frequently handling, fingering, and feeling; and avoiding workplace hazards. *Id.* at 46. Continuing, the ALJ determined that Plaintiff was unable to perform any past relevant work, was a younger individual at the time of the alleged onset date, had a high school education and was able to communicate in English, and that the transferability of job skills was not material because the Medical-Vocational Rules supported a finding that Plaintiff was not disabled. *Id.* at 52.

Considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. *Id.* at 53. Consequently, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, from May 1, 2009 through the date of the decision. *Id.* at 54.

### III. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

### IV. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings

of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389 (1971) (internal citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

**V. RELEVANT MEDICAL HISTORY AND TESTIMONY**

**A. Medical History**

On April 28, 2010, Plaintiff presented to Kenneth Grimm, D.O., and reported progressively worsening right shoulder and upper extremity pain resulting from a work-related injury that occurred in 2000. Tr. at 284. An MRI of Plaintiff's right shoulder revealed a SLAP tear. *Id.* Dr. Grimm indicated that Plaintiff had right shoulder surgery with a SLAP repair and a subacrominal decompression on May 1, 2009. *Id.* Subsequent to this surgery, Plaintiff underwent physical therapy, active release techniques, and anesthetic/steroid injections, none of which provided lasting relief. *Id.* On physical examination, Dr. Grimm indicated that Plaintiff had mild atrophy of his right deltoid/biceps muscle groups, decreased ranges of right shoulder motion, weakness of the right upper extremity, mild tenderness over the right AC joint, and probable psychosocial factors that were affecting his physical condition. *Id.* at 285. Dr. Grimm recommended that Plaintiff enter into

a full-day interdisciplinary chronic-pain rehabilitation program ("CPRP") and prescribed a local anesthetic. *Id.* at 285-86.

On May 25, 2010, an electrodiagnostic test of Plaintiff's right upper extremity showed normal results. Tr. at 374. In July 2010, Plaintiff presented to Jahangir Malekl, Ph.D., for a pain evaluation, complaining of pain affecting his shoulders, neck, and upper body quadrant, as well as difficulty in turning his head and holding his arms out front of his body. *Id.* at 369. Plaintiff also reported sadness, depression, anxiety, frustration, and irritability. *Id.* at 370.

In September 2010, Plaintiff presented for admission to a CPRP. *Id.* at 319. Plaintiff complained of pain in his shoulders and neck, describing the pain as a constant soreness. *Id.* at 320. Additionally, Plaintiff reported stabbing and burning on the front of the head of the humerus, worse on the right than the left, and indicated that he had occasional difficulty holding his arms out to drive his car due to pain and numbness or tingling. *Id.* Upon examination, it was noted that Plaintiff had tenderness in his right upper extremity subcutis, bilateral upper extremity, and upper body quadrant muscle groups, worse on the right. *Id.* at 323. Plaintiff displayed a drooped right shoulder with spasms of the trapezius and scalenus muscles, and was unable to elevate his right arm above his shoulder without experiencing significant numbness in his right arm and hand, as well as severely increased pain. *Id.* Plaintiff displayed decreased right-hand grip strength and it was noted that there was a significant degree of en banc movement across his bilateral shoulders. *Id.* It was also noted that Plaintiff preserved lower extremity sensory motor assessment, normal heel, toe, and tandem gait, and normal coordination. *Id.* Plaintiff was prescribed an anti-depressant and anti-convulsant, and was informed that in view of Plaintiff's refusal to participate fully in the evaluation, he would be monitored and discharged from the CPRP should his compliance with treatment be poor. *Id.*

On September 20, 2010, Plaintiff was admitted to a CPRP hosted by the Cleveland Clinic Foundation. Tr. at 312. While in the CPRP, Plaintiff's treatments included a pain education program, reconditioning physical therapy, individual and group therapy, biofeedback training, family therapy, and occupational therapy. *Id.* at 316. During therapy, Plaintiff showed a significant loss of range of motion and strength in his upper extremities, with a greater loss on the right side, atrophy of his right rotator cuff, and a less than sedentary level of physical ability. *Id.* Nine days

after entering the program, September 29, 2010, Plaintiff was discharged from the CPRP. *Id.* at 312. It was indicated that Plaintiff's progress in the program was limited. *Id.* at 317. Specifically, Plaintiff's participation in physical therapy and psychotherapy was poor, and his participation in occupational therapy was just adequate. *Id.* Plaintiff refused help from his family and refused to share information with them. *Id.* Additionally, Plaintiff was critical of other patients in the program. *Id.*

Plaintiff saw Dr. Grimm again in April 2011. Tr. at 287. Dr. Grimm indicated that Plaintiff had been discharged from the CPRP due to a lack of participation, and that Plaintiff had little interest in returning to the aforementioned program. *Id.*

Due to continued pain, Plaintiff underwent right stellate ganglion blocks on May 24, 2011, June 28, 2011, and July 12, 2011. Tr. at 289-294. Plaintiff was reevaluated by Dr. Grimm on August 15, 2011. Tr. at 295. Dr. Grimm noted that Plaintiff was discharged from his CPRP for poor participation in physical/occupational therapy and psychotherapy, as well as his refusal for collateral involvement from family members. *Id.* Continuing, Dr. Grimm opined that Plaintiff's best short-term and long-term prognosis would be his full participation in an interdisciplinary CPRP. *Id.*

In November 2011, Plaintiff again presented to Dr. Mathews. Tr. at 347. Plaintiff indicated that he had no interest in participating in a CPRP and that he instead wanted more procedures to be performed. *Id.* Dr. Mathews stated that Plaintiff had a good range of movement of his extremities, and was gripping objects with his right upper extremity and resting his weight on his right forearm. *Id.*

In January 2012, Plaintiff began participating in pain management under the care of Maged Fouad, M.D. Tr. at 337. Plaintiff complained of pain in his neck and shoulders. *Id.* A peripheral nerve block was administered on February 13, 2012. *Id.* at 335. On February 23, 2012, Plaintiff reported that his pain regime was effective and muscle spasms were at a minimal, but that intermittent epoisodes of burning sensations in his bilateral shoulders were increasing. *Id.* at 332. On February 23, 2012, Plaintiff visited Thomas Torzok, D.C., for a follow-up regarding his neck and shoulder pain. Tr. at 298. At the visit, it was noted that there was no interval change in Plaintiff's chronic shoulder symptoms and that there was still fairly diffuse tenderness in his shoulder. *Id.*

On March 6, 2012, Plaintiff visited Dr. Anderson. Tr. at 344. Dr. Anderson noted that Plaintiff continued to take Neurontin and indicated that he should return in four to six weeks. *Id.* In April 2012, Plaintiff returned to Dr. Anderson. Tr. at 341. Dr. Anderson did not believe that Plaintiff had reached maximum medical improvement ("MMI") despite the fact that an independent physician Plaintiff visited had determined that Plaintiff had reached MMI. *Id.* Continuing, Dr. Anderson assigned Plaintiff a tentative date of July 1, 2012 to return to work. *Id.* Dr. Anderson noted that Plaintiff experienced significant pain in his biceps and cramping while in the flexed elbow position, with less pain when his arms and elbows were straight. *Id.* Dr. Anderson expressed concern that Plaintiff's condition may not improve enough to resume work as a manual laborer and that he may require a vocational rehabilitation program. *Id.* The same day as the visit to Dr. Anderson, Plaintiff saw Tony Lababidi, D.O. Tr. at 379. Plaintiff reported increased fatigue while taking his muscle relaxant and Dr. Lababidi prescribed a different muscle relaxant. *Id.* Dr. Lababdini noted trigger points present in Plaintiff's right trapezius and his suprascapular muscles, and stated that Plaintiff's pain was aggravated by lifting his shoulders and that the pain was relieved with ice and gabapentin. *Id.* at 380.

Plaintiff visited Dr. Fouad in June 2012. Tr. at 401. Dr. Fouad indicated that Plaintiff had been referred to physical therapy and was attending sessions twice a week for the last four to five months, and that Plaintiff had experienced improvement while using a transcutaneous electrical nerve stimulation ("TENS") unit. *Id.* Plaintiff presented with tenderness in his paravertebral muscles, abnormal lateral bending, diminished right upper extremity strength and range of motion, and positive trigger points in his right traezius and suprascapular muscles. *Id.* at 402.

An August 2012 MRI of Plaintiff's right shoulder showed postsurgical changes involving the superior labrum with a superimposed labral tear, rotator cuff tendinosis, and moderate acromiclavicular joint degenerative arthritis. Tr. at 429. An MRI of Plaintiff's left shoulder revealed a SLAP lesion tear, rotator cuff tendinosis without a tear, and subdeltoid subacromial bursitis. *Id.* at 431. Later that month, Plaintiff followed up with Dr. Anderson, who opined that Plaintiff's symptoms in his right arm were related to chronic regional pain syndrome and noted that

-7-

Plaintiff appeared to have a SLAP tear in his left shoulder, for which surgical intervention was recommended. *Id.* at 440.

Plaintiff presented to Dr. Fouad on September 13, 2012 with discomfort and pain in his bilateral shoulders, occasional numbness in his right hand, and decreased cervical flexion. Tr. at 443. Plaintiff also reported right shoulder and scapula pain in January 2013, and indicated that he was performing exercises at home. *Id.* at 450.

Dr. Anderson met with Plaintiff in April 2013 and recommended the continued use of a TENS unit and anti-convulsant medication. Tr. at 473. Plaintiff reported that he had a flare-up of arm pain after trying to use his arm a little more. *Id.* An MRI of Plaintiff's right shoulder revealed a persistent posterior-superior tear and rotator cuff tendinosis, and an MRI of Plaintiff's left shoulder showed post-surgical changes about the superior labrum, rotator cuff tenodesis, and status-post biceps tenodesis. *Id.* at 467, 469.

Plaintiff presented to Dr. Anderson in July 2013 with complaints of a burning sensation in his shoulders, worse on the right. Tr. at 454. Continuing, Plaintiff reported improvement with use of a TENS unit, but that he still experienced stiffness and numbness in his hands during cold weather, while brushing his dog, and when driving. *Id.* Dr. Anderson recommended a specialist, noting that Plaintiff was in the process of applying for disability benefits and stating that Plaintiff's pain was fairly significant and precluded Plaintiff from being able to drive any significant distance to work or perform work on a computer. *Id.*

In November 2013, state agency physician Olubusolo Brimmo, M.D., examined Plaintiff. Tr. at 476. Upon examination, Plaintiff: exhibited no joint swelling, erythema, effusion, or deformity; was able to lift, carry, and handle light objects; could squat and rise with ease; was able to rise from a sitting position without assistance and had no difficulty getting up and down from the examination table; could walk on his heels and toes; displayed normal tandem walking; could hop on one foot bilaterally; could dress and undress; and was cooperative. *Id.* at 478. Dr. Brimmo assessed weakness in Plaintiff's upper right extremity and limited range of motion in his bilateral upper extremities that would cause problems with overhead lifting and all overhead activities. *Id.* Continuing, Dr. Brimmo indicated that he would restrict any activities requiring overhead lifting or

lifting of Plaintiff's arms above his shoulders because this movement would cause weakness and numbing in his hands. *Id.* Dr. Brimmo indicated that Plaintiff's other functions were "quite good" and that there were no limits on Plaintiff's ability to stand, walk, sit, see, or hear. *Id.* Continuing, Dr. Brimmo opined that Plaintiff: could occasionally lift and carry ten pounds; sit for eight hours per workday; stand for three hours per workday; walk for two hours per workday; never perform a range of actions with his right hand; never operate a motor vehicle; and could occasionally be exposed to moving machinery. *Id.* at 485-86. Dr. Brimmo also opined that Plaintiff could never use his left hand to reach overhead, only occasionally use the hand to reach in other directions, and frequently use the hand to handle, finger, feel, push, and pull. *Id*. at 485.

### B. Hearing Testimony

Plaintiff provided testimony indicating that he lived alone and drove approximately forty minutes to attend the hearing. Tr. at 62-63. Continuing, Plaintiff testified that he sometimes prepared his own meals, washed dishes and used a dishwasher, and did his own laundry using a machine located in the basement of his home. *Id.* at 63-64. Plaintiff stated that he had a friend that took him shopping and that he was able to push a shopping cart on some trips to the grocery store. *Id.* at 64. Plaintiff testified that he was able to shower, but that showers required extra time. *Id.* at 65. Continuing, Plaintiff indicated that he visited with friends at his home or their homes, and that his friends helped him care for his yard. *Id.* at 66. As for exercise, Plaintiff stated that he typically took walks in the park each day. *Id.* Plaintiff testified that he last worked in May of 2009 performing maintenance for a property management company, and that he had also previously worked for a cleaning company and as a construction electrician. *Id.* at 67-69. Next, Plaintiff testified that while he was working his hands would start to go numb as soon as he raised his arms above his head. Tr. at 70. Plaintiff stated that once his hands went numb, the numbness would radiate into his arms, biceps, neck, and face. *Id.*

Continuing, Plaintiff testified that he underwent right-shoulder surgery in 2009, and that he had left-shoulder surgery in 2004 and 2012. Tr. at 73-74. Plaintiff stated that he could not reach above his head and that his hands began to go numb if he raised his arms to a ninety-degree angle. *Id.* at 74. According to Plaintiff, he was unable to lift and carry more than ten pounds. *Id.* at 77.

Plaintiff reported that his daily walks ranged from thirty minutes to ninety minutes and that he walked from half-a-mile to a mile-and-a-half, depending on the day. *Id.* Plaintiff stated that he experienced numbness in his hands while driving, and that his hands and feet had become numb from sitting in the chair at the hearing for ten minutes. *Id.* at 78-79.

Upon examination by his counsel, Plaintiff indicated that he used a TENS unit every day and that he was on medication for his pain. Tr. at 82-83. Plaintiff testified that he participated in a CPRP, but was released from the program since he did not have family that could participate in the program with him and because the program was "geared more towards people with chemical dependencies." *Id.* at 83.

Following Plaintiff's testimony, the ALJ asked the VE a hypothetical question regarding the work that could be performed by an individual of Plaintiff's age, education, and employment background who could: lift and carry twenty pounds occasionally, and ten pounds frequently; stand and walk for six hours, and sit for six hours; climb stairs and ramps, but only occasionally climb ladders, ropes, and scaffolds; balance, stoop, kneel, crouch, and occasionally crawl; reach in front and occasionally overhead; and handle, finger, and feel. Tr. at 90. The ALJ also noted the Plaintiff could not be exposed to hazardous conditions or moving machinery. *Id.* The VE testified that an individual with the above limitations could perform Plaintiff's past work as a cleaner. *Id.* Following the VE's response, the ALJ then asked the same question wherein the hypothetical individual was limited to the following: lifting ten pounds occasionally; standing and walking for six hours with a "sit/stand option every hour for about five minutes," and sitting for six hours; occasionally climbing stairs and ramps; occasionally bending, balancing, stooping, and kneeling, but never crawling; frequently reaching in front and occasionally reaching overhead; frequently handling, fingering, and feeling; and avoiding hazardous work conditions. *Id.* at 90-91. Based on the above limitations, the VE testified that such a person could perform jobs at the sedentary level, providing the examples of addresser, receptionist, and food and beverage order clerk. *Id.* at 91.

Plaintiff's counsel then questioned the VE, modifying the ALJ's second hypothetical individual to be limited to reaching forward only occasionally and handling, fingering, and feeling only occasionally. Tr. at 92. The VE testified that the modified limitations would exclude all work

-10-

at the sedentary level. *Id.* Plaintiff's counsel also asked what impact being off task twenty percent of the day would have on the jobs available to the hypothetical individual. The VE indicated that such a limitation would eliminate any available jobs. *Id.* at 93. Likewise, the VE, in response to a question posed by Plaintiff's counsel, stated that two to three absences per month due to pain would eliminate all work in the economy. *Id.* Following the testimony provided by the VE, the ALJ concluded the hearing. *Id.* at 94.

## VI. ANALYSIS

Plaintiff's sole assignment of error asserts that the ALJ's decision that Plaintiff could perform sedentary work was not supported by substantial evidence because the ALJ relied on VE testimony in response to an incomplete hypothetical question. ECF Dkt. #13 at 7. Specifically, Plaintiff contends that the ALJ's RFC finding was not an accurate reflection of his capabilities because he was found to be able to perform sedentary work, occasionally reach overhead, frequently reach in front, and frequently handle, finger, and feel. *Id.* Plaintiff argues that a review of the evidence of record proves that Plaintiff has greater limitations than those prescribed by the ALJ. *Id.* at 7-8.

To support his position, Plaintiff first looks to the opinion of the consultative examiner, Dr. Brimmo. ECF Dkt. #13 at 8. Plaintiff asserts that Dr. Brimmo opined that he: could lift up to ten pounds occasionally; could not finger, feel, handle, push, pull, or reach with his right upper extremity, but could frequently perform these activities with his left upper extremity; and was unable to reach overhead with his left upper extremity, but could occasionally reach in other directions. *Id.* at 8-9. Continuing, Plaintiff asserts that the limitations imposed by Dr. Brimmo are supported by other evidence in the record, and that these limitations support a more restrictive RFC finding. *Id.* at 9.

As for the other evidence supporting Dr. Brimmo's opinion, Plaintiff first notes his own comments to Dr. Grimm, which consisted of reports of pain that was constant, deep, dull, and aching, with a stabbing sensation that was exacerbated by any activity. ECF Dkt. #13 at 9. Plaintiff also states that Dr. Grimm made objective findings such as atrophy and a decreased active/passive range of motion of the right shoulder. *Id.* Continuing, Plaintiff also points to records from a

-11-

chiropractor showing ongoing neck and shoulder pain with no change in Plaintiff's condition despite treatment. *Id.* Plaintiff asserts that Dr. Fouad treated Plaintiff's neck and shoulder pain, and confirmed numbness and tingling in Plaintiff's right hand. *Id.* Plaintiff indicates that Dr. Anderson confirmed that Plaintiff was experiencing pain and cramping in his biceps, and noted that Plaintiff had a flare-up of pain after attempting to use his arm "a little bit more." *Id.* Finally, Plaintiff states that Dr. Lababidi reported that Plaintiff's pain was aggravated by lifting his shoulders. *Id.* Plaintiff contends that the above portion of the record supports his argument that his limitations are more severe than the limitations found by the ALJ. *Id.*

Next, Plaintiff asserts that the objective evidence also supports a more restrictive RFC finding. ECF Dkt. #13 at 9. To support this assertion, Plaintiff indicates that an MRI of his right shoulder, performed in 2012, showed post-surgical changes involving the superior labrum with superimposed labral tear, rotor cuff tendinosis, and acrominclavicular joint degenerate arthritis. *Id.* Plaintiff also states that an MRI of his left shoulder, performed that same day, revealed a SLAP tear with a labral cyst, rotator cuff tendonosis, and subacrominal bursitis. *Id.* at 10. Continuing, Plaintiff indicates that a second MRI of his right shoulder, performed in 2013, showed a persistent posterior-superior tear and rotator cuff tendinosis. *Id.* Plaintiff states that a second MRI of his left shoulder revealed post-surgical changes about the superior labrum and an intrasubstance tear of the posterior-superior labrum. *Id.*

Continuing, Plaintiff asserts that a more restrictive RFC finding is supported by his testimony. ECF Dkt. #13 at 10. Plaintiff states that he testified to the following: reaching straight in front of him was very difficult and reaching overhead was impossible; reaching in front caused pain and his hands to go numb; holding objects, such as a coffee cup or bottle of water, was difficult and required two hands; assistance was needed to take the top off jars; and it was difficult to eat using utensils, as he had difficulty cutting and he had to switch hands while eating. *Id.*

Defendant contends that the ALJ fully supported her RFC assessment by relying on, among other evidence, Dr. Brimmo's examination findings, Plaintiff's non-compliance with treatment, and Plaintiff's reported activities. ECF Dkt. #14 at 10. First, Defendant asserts that the ALJ extensively discussed Dr. Brimmo's observations and opinion. *Id.* Defendant maintains that the ALJ discussed

Dr. Brimmo's observations that Plaintiff: was able to lift, carry, and handle light objects; could not grasp small objects for more than twenty seconds with his right hand; had no difficulty dressing and undressing or getting on and off the examination table; had intact sensation, normal reflexes, 4/5 muscle strength in his upper right extremity, full strength in his other extremities, and decreased ranges of motion in his shoulders. *Id.*

Continuing, Defendant states that the ALJ described Dr. Brimmo's opinion, which contained more restrictive limitations than found by the ALJ with respect to Plaintiff's use of his upper extremities. *Id.* Defendant asserts that in evaluating an opinion from a non-treating medical source, the ALJ considers the supportability of the opinion and specialization of the medical source, as well as any other factors raised by the claimant or others, and that the ALJ reasonably discounted Dr. Brimmo's upper extremity limitations because the record did not preclude handling, fingering, and feeling. *Id.* (citing 20 C.F.R. §§ 404.1527(c)(3)-(6), 416.927(c)(3)-(6)). Specifically, Defendant indicates that the ALJ found that Dr. Brimmo's upper extremity limitations conflicted with the examination results, which demonstrated Plaintiff's ability to use his arms beyond the limitations imposed by Dr. Brimmo. *Id.* Defendant asserts that, as stated by the ALJ, the examination results revealed that Plaintiff could: grasp, manipulate, pinch, and perform fine manipulations with his left hand; perform normal grasping, manipulating, pinching, and coordination with his left hand; and had full left upper extremity strength. *Id.* Defendant notes that the only left upper extremity abnormality was somewhat decreased ranges of active shoulder motion. *Id.* Based on the above, Defendant claims that Dr. Brimmo's own examination findings do not support greater left upper extremity limitations than those found by the ALJ. *Id.*

Defendant also asserts that Dr. Brimmo's right upper extremity limitations conflicted with examination findings because Dr. Brimmo, in essence, found that Plaintiff could not perform any significant activities with his right arm, however, upon examination Dr. Brimmo stated that Plaintiff had only somewhat diminished right arm extremity strength. ECF Dkt. #14 at 11. Defendant argues that, based on the above inconsistency, the ALJ reasonably declined to adopt the extreme upper extremity limitations provided by Dr. Brimmo, instead relying on Dr. Brimmo's examination findings, and that substantial evidence supports the ALJ's findings. *Id.* at 12.

Next, Defendant asserts that Plaintiff's argument that the record contains certain evidence that supported Dr. Brimmo's upper extremity limitations is nothing more than an invitation for the Court to reweigh the evidence and reach a different conclusion than the ALJ. ECF Dkt. #14 at 12. Defendant also contends that Plaintiff is incorrect in his assertion that the ALJ erred in rejecting Dr. Brimmo's upper extremity limitations despite crediting the opinion in other ways, maintaining that an ALJ, not a doctor, had the responsibility of determining a claimant's RFC. *Id.*

Finally, Defendant argues that the ALJ appropriately discounted Plaintiff's subjective complaints. ECF Dkt. #14 at 12. Defendant indicates that the ALJ noted that Plaintiff was strongly encouraged to participate in a CPRP, however, Plaintiff was discharged from the CPRP due to his poor participation in physical therapy, only adequate participation in occupational therapy, refusal of family help, and criticism directed at other patients. *Id.* at 13. Further, Defendant asserts that Plaintiff told Dr. Grimm that he was not interested in returning to the program despite Dr. Grimm's strong recommendation that he return. *Id.* Defendant argues that it would be reasonable to expect that Plaintiff would be compliant with treatment if he was as limited as he claimed. *Id.* Continuing, Defendant indicates that the ALJ discussed inconsistencies between Plaintiff's subjective complaints and his reported activities. Namely, Defendant contends that the ALJ stated that Plaintiff's testimony that he had difficulty eating conflicted with his statements indicating that he made coffee, ate with his friend, and cooked, sometimes with help, as well as the lack of reported deficits in personal care made by Plaintiff to treatment providers. *Id.* at 13-14. Continuing, Defendant asserts that the ALJ reasonably determined that Plaintiff's reported activities did not show debilitating limitations, specifically noting that Plaintiff: drove himself forty minutes to the hearing and reported that he could drive two hours, despite claiming extreme upper body limitations; lived independently; sometimes prepared his own meals; washed dishes; and exercised and performed household chores on a daily basis. *Id.* at 14. Based on the above, Defendant maintains that the ALJ reasonably discounted Plaintiff's credibility and that substantial evidence supports her decision. *Id.*

The Court is required to affirm the findings of an ALJ if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole*,

-14-

661 F.3d 937. Substantial evidence is defined as "more than a scintilla but less than a preponderance." *Rogers*, 486 F.3d at 234. Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found a claimant disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton*, 246 F.3d at 773.

In the instant case, substantial evidence supports the ALJ's decision. The ALJ provided a detailed discussion of the treatment Plaintiff received from Dr. Brimmo and the opinion based thereon, as discussed above. Tr. at 50-51. Following this discussion, the ALJ indicated that she gave less than full weight to Dr. Brimmo's opinion because the record did not support Dr. Brimmo's opinion precluding Plaintiff's ability to reach, handle, finger, and feel, stating "the exam revealed [Plaintiff's] ability to grasp, manipulate, pinch, and perform fine coordination with his left hand." *Id.* at 50. Continuing, the ALJ stated that Dr. Brimmo had marked the functionality of Plaintiff's right hand as "abnormal," which conveyed less than full ability, rather than complete inability. *Id.* In addition to a discussion of the inconsistencies in Dr. Brimmo's opinion, the ALJ indicated that Dr. Grimm believed that the best course of action for Plaintiff was to participate fully in a CPRP, however, Plaintiff had poor participation in physical therapy and psychotherapy, and was therefore discharged from the program Tr. at 51. When discussing Plaintiff's participation in a CPRP, the ALJ stated that Plaintiff's failure to follow through with Dr. Grimm's recommendation by failing to complete a CPRP suggests that his symptoms were not as severe as alleged. *Id.*

The ALJ next addressed inconsistent statements made by Plaintiff at his hearing. First, the ALJ indicated that Plaintiff reported difficulty eating due to pain and numbness in his hands, however, he also testified that he prepared his own meals, made coffee, and had lunch or dinner at his friend's house. Tr. at 51. Continuing, the ALJ stated that Plaintiff testified that he had difficulty with personal care, yet no where on the record is it noted that he reported significant deficits in this area to medical care providers. *Id.* Further, as indicated by the ALJ, Dr. Brimmo noted that Plaintiff was able to dress and undress without difficulty, and stated that Plaintiff had no difficulty

-15-

holding light objects, despite being limited in the length of time he could hold an object with his right hand. *Id.*

The ALJ also determined that Plaintiff's reported activities were consistent with the ability to perform a range of sedentary work. Tr. at 51. In support of this determination, the ALJ indicated that Plaintiff testified that he drove forty minutes to attend the hearing and that he reported in 2012 that he was able to tolerate driving for two hours with minimal discomfort. *Id.* The ALJ noted that Plaintiff was capable of: preparing his own meals; washing dishes; taking out the trash; living independently; going on walks in the park; visiting friends; exercising and performing household chores on a daily basis; and mowing the lawn on a riding lawn mower, allowing for breaks. *Id.*

Plaintiff cites portions of the medical opinions, medical records, and his own testimony that he believes support a more restrictive RFC finding. ECF Dkt. #13 at 9-10. However, as stated above, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found Plaintiff disabled. After providing a detailed description of the medical history in this case, the ALJ provides numerous reasons why she made the RFC finding that Plaintiff could perform sedentary work with restrictions, including Plaintiff's failure to follow the recommendations of his physicians and inconsistencies in Plaintiff's statements about his pain and statements about his abilities and daily activities. Tr. at 51. The evidence relied upon by the ALJ was substantial, and therefore, even if Plaintiff was able to show that a preponderance of the evidence exists in the record upon which the ALJ could have found Plaintiff disabled, the decision of the ALJ must be affirmed.

Plaintiff asserts that the hypothetical question posed to the VE, which was relied upon by the ALJ when determining Plaintiff could perform sedentary work, did not present a complete assessment of Plaintiff's impairments. ECF Dkt. #13 at 7-8. Since the ALJ's RFC finding was supported by substantial evidence, and that RFC finding was the basis for the hypothetical question posed to the VE, Plaintiff is incorrect in asserting that the hypothetical question was incomplete. The ALJ posed a hypothetical question to the VE based on a RFC finding supported by substantial

evidence, and then properly relied upon the testimony of the VE. Accordingly, Plaintiff's sole assignment of error fails.

## VII. RECOMMENDATION AND CONCLUSION

For the foregoing reasons, the undersigned RECOMMENDS that the Court AFFIRM the ALJ's decision and dismiss the instant case in its entirety with prejudice.

Date: July 11, 2016                     */s/George J. Limbert*
                                                            GEORGE J. LIMBERT
                                                            UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. L.R. 72.3(b).